FILED

AUG 0 6 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | I N F O R M A T I O N |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO. **1 :26 CR 0 0 3 5 3** |
| | ) | Title 18, United States Code, |
| JOIREAN CREEL, | ) | Section 1349 |
| ADRIANE CREEL, | ) | |
| | ) | **JUDGE RUIZ** |
| Defendants. | ) | |

GENERAL ALLEGATIONS

At all times relevant to this Information, unless otherwise specified:

Defendants and the Scheme to Defraud Ohio's Pandemic Unemployment Insurance Program

1.     Defendant JOIREAN CREEL resided in or around Cleveland, Ohio, in the Northern District of Ohio.

2.     Defendant ADRIANE CREEL resided in or around Bedford, Ohio, in the Northern District of Ohio.

3.     Defendants both obtained positions with a subcontractor for the Ohio Department of Job and Family Services ("ODJFS"), the agency that administered Ohio's unemployment insurance program, including federally funded unemployment benefits during the COVID-19 pandemic. Through their positions, Defendants were given access to an online system for processing and managing unemployment claims, ostensibly to help claimants by providing telephonic customer service. Instead, Defendants abused their positions and their access to the system, soliciting and accepting bribes and kickbacks and causing approximately $2 million in benefits to be paid, generally on claims that had been held for suspected fraud.

Unemployment Insurance Background

4. The Social Security Act of 1935 initiated the federal and state unemployment insurance ("UI") system. The UI system provided temporary financial assistance to eligible lawful workers who were unemployed through no fault of their own. The purpose of the UI system was twofold: to lessen the effects of unemployment through direct cash payments to laid-off workers; and to ensure that life necessities were met weekly while the worker sought employment.

5. State unemployment systems and benefits were joint federal and state enterprises administered by the State Workforce Agency ("SWA") of a given state and largely financed by taxes on private employers located in the state. SWAs administered UI programs in accordance with federal laws and regulations. Each state set its own additional requirements for eligibility, benefit amounts, and length of time benefits were paid. Generally, UI weekly benefit amounts were based on a percentage of a lawful worker's earnings over a base period. When state unemployment benefits were exhausted, the U.S. Department of Labor ("DOL") could supplement them with federal funds.

6. Because of the COVID-19 pandemic, the SWAs' ability to provide UI benefits were expanded. On or about March 13, 2020, the President declared the ongoing COVID-19 pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia, pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5207. On or about March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act into law. The CARES Act expanded SWAs' ability to provide UI for many workers impacted by COVID-19, including for workers who were not ordinarily eligible for UI

2

benefits. The CARES Act provided for three new temporary UI programs (collectively, "Pandemic UI"), including Pandemic Unemployment Assistance ("PUA").

7. PUA provided for up to 39 weeks of benefits to individuals who were self-employed, seeking part-time employment, or otherwise would not qualify for regular or extended benefits under state or federal law or other CARES Act programs. Under the PUA provisions of the CARES Act, a person who was a business owner, self-employed worker, independent contractor, or gig worker qualified for PUA benefits administered by the State SWAs if the individual previously performed such work in a State and was unemployed, partially unemployed, unable to work, or unavailable to work due to a COVID-19-related reason. The eligible timeframe to receive PUA was for weeks of unemployment beginning on or after January 27, 2020, through approximately September 2021.

8. PUA funds were distributed to program participants by the SWA, after the SWA received the funds from the United States Department of the Treasury. While there were different paths that payments could take from the Treasury Department to a given SWA, all such payments were routed through multiple states and across multiple state lines in interstate commerce.

9. The Ohio SWA was the Office of Unemployment Insurance Operations, which was part of ODJFS. The Ohio SWA's servers for PUA claims were located in Virginia.

10. ODJFS used Bank 1 to administer Pandemic UI benefits. Bank 1 was a federally insured financial institution headquartered in Minneapolis, Minnesota. Bank 1's servers were located in the States of Minnesota and Kansas. If ODJFS approved the claimant's application, Bank 1 mailed a debit card to the claimant which was subsequently loaded with benefits on the claimant's card at certain intervals. ODJFS also allowed a claimant to receive UI benefits

3

through direct deposit into a bank account of the claimant's designation, with payments sent via automated clearing house (or "ACH") deposit from Bank 1.

11. To obtain Ohio Pandemic UI, an individual could apply online through the ODJFS website, the servers for which were located in Virginia. Claimants answered various questions to establish their eligibility. Claimants were required to provide personal identifying information, which included their name, mailing address, gender, email, phone number, social security number, and date of birth (collectively, "personal identification information"). Moreover, claimants had to identify a qualifying occupational status and COVID-19-related reason for being unemployed. Claimants could also submit certain documents as evidence of their income.

<u>Defendants' Access to Ohio PUA Claims</u>

12. ODJFS contracted Entity 1 to assist with the PUA process due to the high demand placed on ODJFS. The process included setting up a system, the Unemployment Framework for Automated Claim & Tax Services ("uFACTS") to process PUA claims, as well as setting up call centers for serving ODJFS clients and potential clients on behalf of ODJFS, using the uFACTS system. The servers for the uFACTS system were hosted in Virginia, but accessed remotely by workers in Ohio and elsewhere.

13. Entity 1 contracted with Entity 2, a staffing agency, to provide Entity 1 with persons hired to staff the call centers, including seasonal teleservices representatives, who generally worked remotely, including from Ohio, and who were tasked with providing customer service to claimants, and given access to the uFACTS system to perform their duties, using a userID and authentication criteria unique to each person, and not to be shared with anyone else or used for any unauthorized purpose.

4

14. On or about February 10, 2021, Entity 2 hired JOIREAN CREEL as a remote seasonal teleservices representative, and because of her position with Entity 2, which required her to act on behalf of ODJFS, Entity 1 provided her access to the uFACTS system. On or about March 25, 2021, Entity 2 terminated JOIREAN CREEL from this position due to her failing to log into work on time and failing to appear for work on designated and assigned workdays. Despite her termination, JOIREAN CREEL's assigned userID continued to access the uFACTS system without authorization until on or about June 9, 2021, when her userID stopped working to access the system.

15. On or about February 17, 2021, Entity 2 hired ADRIANE CREEL as a remote seasonal teleservices representative, and because of her position with Entity 2, which required her to act on behalf of ODJFS, Entity 1 provided her access to the uFACTS system. On or about June 7, 2021, Entity 2 terminated ADRIANE CREEL from this position due to her failing to log into work on time and failing to appear for work on designated and assigned workdays.

16. Although Defendants, due to their official positions, were expected to act on behalf of ODJS to assist claimants and access their claims in uFACTS, they were not trained or authorized to void, nullify, or otherwise remove fraud issues in pending PUA claims, or to cause claims to be approved or paid without approval from supervising persons. Without authorization, Defendants used, and caused to be used, Defendants' userIDs to access the uFACTS system and nullify and void fraud issues on numerous claims, and otherwise cause claims to be paid that would not have been paid without that unauthorized action and abuse of the power granted to them by virtue of their official positions, and abuse of JOIREAN CREEL's continued access to uFACTS system.

COUNT 1

(Conspiracy to Commit Wire Fraud and Honest Services Wire Fraud, 18 U.S.C. § 1349)

The United States Attorney charges:

17. The factual allegations contained in paragraphs 1 through 16 of this Information are re-alleged and incorporated as though fully set forth herein.

The Conspiracy and Scheme to Defraud

18. From in or around June 2020 through in or around October 2021, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants JOIREAN CREEL and ADRIANE CREEL, and others known and unknown to the United States Attorney, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit federal fraud offenses, that is:

a. to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343; and

b. to knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and deprive the State of Ohio and the citizens of the State of Ohio of their intangible right to the honest services of Defendants, state officials, by means of material false and fraudulent pretenses, representations, and promises, through bribery, and to transmit and cause to be transmitted by means of wire communication in interstate commerce, any

6

writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice

to defraud and deprive, in violation of Title 18, United States Code, Sections 1343 and 1346.

The Objects and Purposes of the Conspiracy and Scheme

19.    The objects and purposes of the conspiracy and scheme included, but were not

limited to, the following: for the conspirators to unjustly enrich themselves and their designees

by (a) causing ODJFS and other SWAs to pay benefits through false statements and material

concealments, (b) receiving bribes and kickbacks in exchange for modifying claims using

Defendants' positions working on behalf of ODJFS and their resulting access to the uFACTS

system, (c) diverting proceeds for the conspirators' use and the use and benefit of others, and

(d) concealing the conspiracy and scheme.

Manner and Means of the Conspiracy and Scheme

20.    It was part of the conspiracy and scheme that:

a.    Defendants sought out people who had filed, or would file, claims for

PUA with ODJFS, offering to cause those claims to be approved by ODJFS despite the claims

being denied or placed on hold due to suspected fraud, in exchange for payment of a bribe or

kickback. They primarily contacted people they knew and then collected referrals by word of

mouth.

b.    Despite JOIREAN CREEL having been terminated, Defendants gave the

impression that she still worked for ODJFS, and offered to use her position, and ADRIANE

CREEL's position, to modify their claims.

c.    Using JOIREAN CREEL's unlawful access to uFACTS after her

termination, and using ADRIANE CREEL's access to the uFACTS system by virtue of her

position acting on behalf of ODJFS, JOIREAN CREEL accessed claims of claimants who had

7

agreed to pay kickbacks, and modified those claims to cause ODJFS to pay PUA benefits to the claimants that were not being paid, largely by modifying claims to void and nullify fraud holds on the claims. Defendants concealed their misuse of their access to the PUA claim system from ODJFS and other authorities.

      d.     By modifying the claims, JOIREAN CREEL caused ODJFS to pay claimants thousands of dollars in PUA benefits, including both a lump sum for retroactive benefits purportedly due from the date of the original claim through the date of the fraudulent approval, and continuing benefits to paid from the date of the fraudulently obtained approval going forward, generally in weekly installments. JOIREAN CREEL fraudulently modified approximately 145 such claims using her uFACTS userID after her termination, causing approximately $1.9 million in PUA benefits to be paid, and modified additional claims using ADRIANE CREEL's uFACTS userID, causing a total of approximately $1,960,463 in PUA benefits to be paid on the modified claims.

      e.     Defendants arranged for claimants to pay bribes or kickbacks to JOIREAN CREEL in various forms, and in varying amounts, including through mobile phone application person-to-person transfers and cash payments, which had generally been promised to be paid from the lump-sum retroactive benefit awards, and which they concealed from ODJFS and other authorities, despite that benefits were represented in all claims to be paid to the claimants. Defendants generally arranged for kickbacks of hundreds or thousands of dollars for each claim.

      f.     From time to time, Defendants also sought Pandemic UI benefits in their own names, based on a range of misstatements, including benefits from ODJFS and from SWAs in states where they had never lived. JOIREAN CREEL submitted a fraudulent application to ODJFS seeking unemployment benefits despite being employed by the U.S. Postal Service,

fraudulently obtaining over $31,000 in benefits, and also caused fraudulent applications in her own name to be submitted to SWAs in Massachusetts, Nevada, New York, Pennsylvania, and West Virginia. ADRIANE CREEL caused fraudulent PUA applications in her own name to be submitted to ODJFS and SWAs in California, Nevada, New York, and Pennsylvania, fraudulently obtaining over $26,000 in benefits.

g.      From time to time, Defendants made false certifications to ODJFS and other SWAs about the continuing truth of representations in their applications for Pandemic UI. For example, JOIREAN CREEL regularly certified to ODJFS that she remained unemployed and had no other sources of income, including while employed by the U.S. Postal Service and even while employed by Entity 2 to work for ODJFS, and also while receiving substantial income from kickbacks through the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

DAVID M. TOEPFER
United States Attorney

By:      _____

Robert F. Corts
Chief, Criminal Division

9